UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE ACCOUNT HILLCHIP047@GMAIL.COM WITH PHONE NUMBER 802-505-8004 THAT IS STORED AT PREMISES CONTROLLED BY LIFE360 | Case No. 2:20-MJ-30 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Tam Vieth, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by Life360, Inc. ("Life360"), an electronic communications service headquartered at 539 Bryant Street, Suite 402, San Francisco, California, 94107. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Life360 to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.  I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), duly appointed according to law. I have been a Special Agent with the ATF for over five years. My assignments have included investigating criminal violations of federal firearms statutes, arson statutes, and narcotics offenses related to the possession and distribution of controlled substances.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Glenn "Chip" HILL, III violated 18 U.S.C. § 844(i), maliciously damaging or destroying by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce. There is also probable cause to search the information described in Attachment A for evidence of this crime further described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6. During the course of this investigation, I have reviewed an affidavit written by Detective James Pontbriand of the Barre City Police Department, charging HILL with violations of Vermont State law, including Second Degree Arson. I have also reviewed reports written by Vermont State Police (VSP) detectives of the Arson and Explosives Investigations Unit, which includes a certified fire investigator, and I have discussed this case with them.

### January 11, 2020 Fire at Hardrock Granite in Barre, Vermont

7.      On January 11, 2020, at approximately 3:29 PM, the Barre City Fire Department was dispatched to a report of a structure fire at 95 Boynton Street in the City of Barre, Vermont. 95 Boynton Street is the location of Hardrock Granite, an industrial business complex owned by Scott Macaskill.

8.      Upon the fire department's arrival, they found a fully involved structure fire. Multiple fire agencies were required to respond to assist in the control and containment of the fire and to prevent it from spreading to nearby businesses. Power was shut off from that area of Barre for several hours and residents' water supply was interrupted to assist fire services in combating the fire. The fire was eventually extinguished several hours later, but the building itself, the equipment inside, and several vehicles on the property were considered a total loss. Estimated financial losses were well over a million dollars.

9.      State Fire Investigators arrived on scene and commenced an investigation into the cause and origin of the fire. It was initially determined that the fire likely originated in the rear of the building in an open garage area of the structure.

10.     Investigators were able to obtain video footage from a neighboring business (Miles Supply) that showed a maroon Jeep Cherokee travelling on Boynton from South Main Street at approximately 1:59 PM on January 11, 2020. The vehicle enters the driveway of Hardrock Granite and travels toward the rear of the building. At approximately 3:26 PM, the vehicle pulls out the same way and travels down Boynton toward Ayers Street. The vehicle appears to be travelling at a high rate of speed, and a witness, Dan Orton, told investigators that the vehicle almost hit him as it was leaving. The witness also identified the maroon Jeep Cherokee.

11. The video goes on to show at the same time the vehicle departs the business, black heavy smoke can be seen rising from the business.

12. Video obtained from Spaulding High School around the time of the fire shows the Jeep approach the intersection of Boynton and Ayers Streets in Barre. The vehicle then is seen turning right on to Batchelder Street toward Cedar Street.

13. Investigation was able to identify the vehicle as belonging to HILL. Investigators learned that HILL has worked off and on for the area granite industry and has done work for Scott Macaskill both at the business on Boynton and more recently at his personal residence. Furthermore, HILL sought and received permission from Macaskill to store a vehicle at the business while he moved from his residence in Williamstown.

**Interview with HILL on January 12, 2020**

14. On January 12, 2020, investigators located HILL and the maroon Jeep at a residence on Cedar Street in Barre, Vermont. Cedar Street is in close proximity to Boynton and would be accessed from Boynton by travelling toward Ayer as the vehicle in the video is shown doing.

15. According to Det. Pontbriand's affidavit, investigators spoke with HILL and it appeared that HILL was extremely intoxicated. HILL told investigators that he had been in the area of the fire approximately 10 times that day as he went to the South End Cumberland Farms. South End Cumberland Farms in located approximately $1/10^{th}$ of a mile from the location of the fire. When asked if he had been at 95 Boynton Street, HILL became defensive and asked investigators if they were accusing him of setting the fire. Investigators ceased questioning at that time.

16.     At the time of this initial questioning, HILL was staying at the residence of Mark Graves at 5 Cedar Street. A maroon colored Jeep with Vermont tag HDC976 was located at the residence. The vehicle's registration comes back to a James Abbott. During the interview, HILL advised investigators that he purchased the maroon Jeep from Abbott. The tag is expired but the vehicle was in the possession of and was being operated by HILL in an incident the police responded to in July of 2019. HILL's license is criminally suspended.

### Interview with HILL on January 13, 2020

17.     On January 13, 2020, investigators interviewed HILL at the Barre City Police Department. HILL was read his *Miranda* warnings prior to the interview, and he agreed to speak with investigators. HILL was questioned about his knowledge of the fire. HILL denied being there and stated that the vehicle on video was not his. HILL stated that the maroon Jeep in the driveway of Cedar Street is his, and he is the sole operator. He did not give anyone permission to drive his vehicle the day of the fire.

18.     HILL also provided a timeline of his whereabouts. HILL stated that he spent Friday night (the night before the fire) at 5 Cedar Street. He slept in the garage and awoke around 4:30 AM. Hill went back to sleep and eventually woke up later that morning. He made a trip to Cumberland Farms and came back to 5 Cedar Street where he fell asleep again. He was awoken by his friend, Mark Graves, around 3:30 PM. Graves told HILL he was late for picking up his child. HILL advised investigators that he was supposed to pick up his daughter at 3:00 PM in Williamstown. He left the residence and travelled down Circle Street onto South Main and out toward Williamstown. Investigators asked HILL if he noticed the fire and smoke coming from Boynton Street as he was heading down Circle Street. HILL stated he did not. I am aware from reviewing photographs of the fire and from conversations with other

5

investigators, including investigators who were at the location of the fire, that at approximately 3:40 PM on the day of the fire, the smoke coming from the fire was obvious and could be seen for miles. I also learned that Circle Street was very congested with motor vehicle traffic and curious onlookers trying to get a view of the fire. HILL claimed that he did not notice any of that. When asked how that was possible, HILL replied that he was so drunk he didn't notice.

19. Below is a portion of a photo of the fire taken by a witness, John Fabbioli, who also reported the fire via 911 call:



### Search Warrant of HILL's Vehicle

20. As investigators were conducting the interview with HILL on January 13, 2020, other investigators were executing a warrant on HILL's vehicle that was obtained by the Barre City Police Department earlier in the day. Investigators found a receipt from the McDonalds in South Barre, time-stamped 3:44 PM on January 11, 2020 (the day of the fire). Investigators

interviewing HILL learned this information during the interview and asked HILL if he stopped anywhere on his way to Williamstown. He stated that he did not. He also stated he did not stop anywhere for food. When confronted with an image of the receipt, he said that he must have stopped there and forgot. Investigators also asked HILL if it was possible if he forgot that he was at Hardrock Granite shed on Boynton Street. HILL stated that he was not at the shed (those in the local granite industry refer to industrial granite processing and storage facilities, regardless of size, as "sheds") on Boynton Street. He became very upset that investigators did not believe him and repeatedly stated that investigators were trying to compel him to admit to something he didn't do. Investigators advised him that was not the case and that they were merely trying to get to the truth. HILL shared with investigators during the interview that he is an alcoholic and essentially drinks from the time he gets up to the time he goes to bed.

21.     During the interview with HILL, investigators talked about the car he had stored at Hardrock Granite. HILL stated that the vehicle was a Ford convertible he had purchased for his 19 year old son, Shane. He told investigators that it was his intent to motivate Shane to get a job and be self-sufficient, using the car the car as a reward. The value of the car was estimated to be approximately $3,000.00. The car was a total loss after the fire.

### Interviews with HILL's Family Members

22.     Investigators also interviewed witnesses and family members and learned that HILL's timeline provided to investigators was not accurate. HILL's wife was identified as Christina Hill. Christina Hill and Glenn HILL have multiple children together. HILL's wife stated that he spent Friday night (the night before the fire) at the residence in Williamstown, and on Saturday morning they had an argument regarding HILL's 19 year old son, Shane. She stated that HILL was upset that Shane had done nothing to improve his situation and was "mooching"

7

off of them. Shane overheard the conversation and confronted his father. HILL then left the residence upset. HILL told his wife that he was going to look for his un-employment check and get cigarettes. He never came back. HILL was supposed to give his young daughter a ride to a friend's house on Saturday (the day of the fire) around 3:00 PM. He did not show up at that time and did not respond to an initial text from her. When he did show up well after 4:00 PM, she said he was heavily intoxicated, and she refused to get in the car with him.

### Further Examination of Fire Scene

23. Based on the information received during interviews and the concern that the vehicle stored at the shed may have been a point of contention for HILL, fire investigators re-examined the scene. An excavator was brought in to help move debris from the area of HILL's vehicle. Examination revealed that the driver's side door was open at the time of the fire. This is noteworthy as the car was being stored and previously had a cover over it. The owner of Hardrock Granite remembered seeing it there the day prior to the fire with the cover still on the vehicle. In addition, burn patterns from the vehicle and the surrounding location indicated that the fire likely started in the vehicle itself.

### HILL's Use of Life 360 Application

24. I learned the following information from Det. Sgt. Todd Ambroz of the Vermont State Police. On January 14, 2020, Det. Sgt. Ambroz spoke to Gage Hill, one of Glenn HILL's sons.

25. Gage Hill told Det. Sgt. Ambroz that he shared an application on his cell phone with his father, Chip HILL. This particular phone application is called "Life360." As further described below, I have learned that Life360 is a location-based, GPS-system used to track family and friends when installed on a smartphone, and that Life360 provides maps to show user

location. According to Gage, both he and Chip HILL have this application on their phones, and they can see where each other are at based on movement, speed, direction, and even duration at a particular location. Gage stated he had this app, but because it was just the base app that was free, he did not have his father's data for January 11, 2020 (the date of the fire) because it only stores the data for two days. Gage then told Det. Sgt. Ambroz if he upgraded to the premium version for $8.00, it would populate the history of his and his father's cell phone for the last 30 days.

26. Det. Sgt. Ambroz told Gage and his mother, Christina Hill, that this is something that would help the investigation and told them it was just as important to prove someone's innocence as it was their guilt, that the upgraded app should show if Chip HILL was or wasn't at Hard Rock Granite on Boynton Street in Barre, and that it was one more piece of the puzzle. Det. Sgt. Ambroz gave them time to think about whether or not to purchase the upgrade and that he would be in touch with them.

27. On January 15, 2020, Det. Sgt. Ambroz contacted Christina Hill and asked if she'd be willing to speak further and if she had discussed the Life360 app with her son. She said they wanted to do the right thing, regardless of the outcome, and were willing to upgrade Life360 but wanted to do it in front Det. Sgt. Ambroz, who agreed to meet with them on Thursday, January 16, 2020.

28. On January 16, 2020 at approximately 2:00 PM, Det. Sgt. Ambroz drove to Williamstown and met with Christina and Gage Hill. In Det. Sgt. Ambroz's presence, Christina Hill paid for the upgrade, and Gage upgraded the Life 360 app. Within a few seconds, the 30-day history of Glenn HILL's and Gage's locations began to unfold. Det. Sgt. Ambroz looked at the app with Gage and observed that on the day of the fire, January 11, 2020, the Life360 app

9

showed HILL located at Hardrock Granite in Barre at the time of the fire, from 2:22 PM to 3:31 PM. Once this phone app was upgraded, it also upgraded and added the history to HILL's cell phone, which was already in Det. Pontbriand's possession.

### January 17, 2020 Interview with HILL

29.     On Friday, January 17, 2020, Det. Sgt. Ambroz and another investigator met with HILL at the residence on Cedar Street. Investigators read HILL his *Miranda* rights, which he agreed to waive. Investigators questioned HILL further about his whereabouts on the day of the fire. Although HILL was presented with information that his vehicle and his phone were at the fire scene, he adamantly denied being there. Det. Sgt. Ambroz told him to think on the situation and to contact him if he could remember anything different.

### January 20, 2020 Interview with HILL

30.     On Monday, January 20, 2020, Det. Pontbriand met with HILL. After HILL agreed to waive his *Miranda* rights, HILL stated that he thought on his movements from Saturday (the day of the fire) and now remembered leaving Williamstown and then going to his friend's shed on Vine Street in Barre to pick up an air mattress. He then believed he went to Cumberland Farms (video from that location contradicts this). He then remembered stopping at Hardrock Granite (where the fire occurred) on Boynton Street to "take a piss," smoke a cigarette, and listen to music. He believed he was only there 10 minutes. When confronted with the GPS information and videos that showed HILL was there for a longer time, HILL stated he had been drinking and loses track of time. He stated that "if he did this" it was not intentional. Hill stated he was still willing to take a polygraph.

### January 24, 2020 Polygraph Examination

31. On January 24, 2020, HILL was scheduled to take a polygraph test at the VSP Middlesex Barracks. Prior to the scheduled 2:00 PM test, HILL contacted Det. Pontbriand and stated he wanted to speak prior to taking the test. Det. Pontbriand met with HILL at the Cedar Street residence. HILL stated that his earlier statement on January 20, 2020 was a lie. He did not recall being at Hard Rock Granite and was told to make the comments about stopping there to smoke by a family member.

32. After speaking with HILL, Det. Pontbriand brought him to his polygraph examination. HILL told the examiner that his previous comments about having a memory about being at Hardock Granite to smoke cigarettes and relieve himself were a lie. HILL continued to assert that he had no memory of being at Hardrock Granite during the time frame in question. HILL alternately made statements throughout the polygraph process such as I don't remember being there or I couldn't have done this and if I did do this it wasn't intentional. Ultimately, the polygraph results were inconclusive.

### Arrest of HILL and Preservation Request

33. On January 28, 2020, HILL was arrested on Vermont state charges.

34. On February 6, 2020, Det. Sgt. Ambroz sent a preservation request to Life360 requesting the preservation of all available data for the phone number 802-505-8004 which belongs to Glenn "Chip" HILL.

### Vermont State Police Fire Investigation Report

35. I reviewed a Fire Investigation Report prepared by Det. Sgt. Michael Lacourse of the Vermont State Police Arson and Explosives Investigations Unit. Det. Sgt. Lacourse is an arson investigator but not a certified fire investigator. I have also spoken with Det. Sgt. Todd

Ambroz, who is a certified fire investigator. Det. Sgt. Ambroz was involved in the investigation into the fire at 95 Boynton Street, Barre, Vermont and concurred with the conclusions in the Fire Investigation Report.

36. The Fire Investigation Report concluded that the fire was "incendiary" in nature, meaning that it was a deliberately set fire.

37. The Fire Investigation Report also concluded that the likely specific area of origin was the interior of HILL's 1996 Ford Mustang convertible and that was stored inside the warehouse area of Hardrock Granite.

### Information about Life 360 App

38. According to Life 360's app, "Life 360 is the world's leading realtime, location-sharing app, and is the best way to coordinate with family and friends." In addition, Life 360's "Family & Friend Locator" can be used to "[v]iew the realtime location of friends or family members on a private map" and "[s]ee past location history," among other capabilities. I am also aware that, according to Life 360's website, the Life 360 app has "in-app chat" capability as well as "smart notifications" that alert users about other users' movements.

39. I also know that, in general, providers like Life 360 ask each of their subscribers to provide certain personal identifying information when registering for an account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, e-mail addresses, and, for paying subscribers, a means and source of payment (including any credit or bank account number).

40. Providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations,

the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account. In addition, providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

41.     In some cases, account users will communicate directly with a provider about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

42.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Life 360 to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

43.     Based on the forgoing, I request that the Court issue the proposed search warrant.

44.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

45.     The government will execute this warrant by serving the warrant on Life360. Because the warrant will be served on Life360, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

_____
Tam Vieth
Special Agent, ATF


Subscribed and sworn to before me on February 11th, 2020.

_____
HON. JOHN M. CONROY
UNITED STATES MAGISTRATE JUDGE